Opinion issued August 27, 2009 















In The

Court of Appeals

For The

First District of Texas






NO. 01-07-00935-CV

__________


LEONARD SHEPPARD, JR., TRUSTEE, Appellant


V.


INTERBAY FUNDING, LLC, Appellee






On Appeal from the 400th District Court

Fort Bend County, Texas

Trial Court Cause No. 06-CV-148590






O P I N I O N

 Appellant, Leonard Sheppard Jr., Trustee, challenges the trial court's rendition
of summary judgment in favor of appellee, Interbay Funding, LLC ("Interbay"), in
Interbay's suit against Sheppard for declaratory judgment. In two issues, Sheppard
contends that the trial court erred in granting Interbay summary judgment on the
ground that Interbay was "entitled to an equitable first lien" on a piece of real
property and in denying his cross-summary judgment motion. In its sole cross issue,
Interbay contends that although the trial court correctly granted it summary judgment
on the ground that Interbay held an equitable first lien on the real property, the trial
court erred in denying it summary judgment on the ground that Interbay was
"contractually subrogated to the first lien position" on the real property.

 We modify the judgment of the trial court to delete all uses of the word
"equitable" when referring to the first lien held by Interbay on the real property, and,
as modified, we affirm the judgment of the trial court.Factual and Procedural Background

 The critical facts are largely undisputed. On September 25, 2002, Julian
Kimble purchased a piece of real property from Lake Olympia Development
Corporation. Kimble financed the purchase of this real property with two loans, one
from Interbay in the amount of $357,500 (the "Interbay loan") and one from Lake
Olympia in the amount of $213,500 (the "Lake Olympia loan"). These loans were
evidenced by two separate promissory notes (the "Interbay note" and "Lake Olympia
note") executed at the closing on September 25, 2002. The amounts owed under
these notes were secured by two separate deeds of trust (the "Interbay deed" and
"Lake Olympia deed") recorded in the real property records. The Interbay deed
provided security for the obligation in the Interbay note as well as "each obligation
contained in any renewal, extension, amendment, modification, consolidation, change
of, or substitution or replacement for, all or any party of this [Interbay] Note [and]
this Security Intstrument [Interbay Deed], . . . ." The Lake Olympia deed
acknowledged that the lien created by that deed (the "Lake Olympia lien") would be
subordinate to the lien created by the Interbay deed (the "Interbay lien") as well as
any liens arising from any "renewals, extensions, and modifications" of the Interbay
note. Also at closing, Lake Olympia assigned the Lake Olympia note and deed to
Property Sales & Management, L.L.C. ("PSM"). (1)

 On April 28, 2004, Kimble refinanced his Interbay loan (the "Interbay
refinanced loan"). Kimble signed a new note (the "Interbay refinanced note")
reflecting a new principal amount of $560,000, and Kimble also signed a deed of trust
in favor of Interbay (the "Interbay refinanced deed") to secure payment of the
refinanced loan, which created a lien (the "Interbay refinanced lien") on the real
property. As reflected in the settlement statement executed at the refinancing closing,
$407,210.52 of the proceeds from the Interbay refinanced loan were used to pay the
outstanding balance of the Interbay note, $107,199.63 of the proceeds were paid
directly to Kimble, and the remaining proceeds were used to pay settlement charges,
among other things.

 After the refinancing, a dispute arose between the parties as to the priority of
the Interbay refinanced lien and the Lake Olympia lien. Interbay filed suit against
PSM, seeking a declaration that, by refinancing the original Interbay note, it
maintained "an equitable first lien on the Real Property in the amount of $407,210.52,
which represents the balance of the first lien prior to the refinance." Interbay further
contended that it had been equitably subrogated to the rights arising from the original
Interbay note and deed. Interbay amended its petition to add Sheppard as a party after
PSM assigned the Lake Olympia note and deed to him. 

 Interbay filed its summary judgment motion, seeking a declaration "to confirm
[its] superior lien status." In its motion, Interbay contended that it had a "contractual
superior lien" and, in the alternative, a "valid equitable lien" or an "equitable
contractual superior lien" through "subrogation." It also contended that Lake
Olympia had released its lien and, thus, PSM had no lien to assign to Sheppard. 

 In support of its contractual superior lien argument, Interbay asserted that
Kimble had refinanced the original Interbay loan to modify the interest rate and
receive cash and, in refinancing the Interbay loan, Interbay had never intended for its
superior Interbay lien, arising from the original Interbay note and deed, to become
inferior to the Lake Olympia lien. As evidence of its intent, Interbay cited the
following language contained in section 11.12 of the Interbay refinanced deed:

 SUBROGATION. If any or all of the proceeds of the Note have been
used to extinguish, extend, or renew any indebtedness heretofore
existing against the Property, then, to the extent of the funds so used,
Lender shall be subrogated to all the rights, claims, liens, titles, and
interests existing against the Property heretofore held by, or in favor of,
the holder of such indebtedness and such former rights, claims, liens,
titles, and interests, if any, are not waived but rather are continued in full
force and effect in favor of Lender and are merged with the lien and
security interest created herein as cumulative security for the repayment
of the Debt, the performance and discharge of Borrower's obligations
hereunder, under the Note and Other Security Documents and the
performance and discharge of the Other Obligations.


Interbay further asserted that the Interbay refinanced note and deed constituted a
"renewal, extension[,] and modification" of the original Interbay note and deed. Also,
it was Interbay's intent for its "contractual superior lien to remain in full force and
effect as a superior lien by the merging of the two Deeds of Trust." To show its
intent, Interbay cited the provision entitled "Prior Lien" contained in the subordinated
Lake Olympia deed, which stated,

 The [Lake Olympia] lien created by this [Lake Olympia] deed of
trust will be subordinate to the [Interbay] lien securing payment of [the
Interbay] note, and any renewals, extensions, and modifications thereof,
in the original principal amount of [$357,500], executed by [Kimble],
payable to [Interbay].


(Emphasis added). Interbay argued, thus, that Lake Olympia had expressly agreed in
the Lake Olympia deed that the Lake Olympia lien would, from the inception, be
subordinated to Interbay's lien and that Interbay would maintain a "first superior
lien," even after any renewals, extensions, and modifications of the original Interbay
note. 

 Alternatively, in support of its claim to an "equitable contractual superior lien,"
Interbay asserted that, based on the above facts, it also maintained, as a matter of law,
a superior lien for the same amount through "equitable subrogation." Interbay
attached to its summary judgment motion a release signed by Andrew Choy on behalf
of Lake Olympia on September 25, 2002, the date of the original closing, which
provided that Lake Olympia was releasing its lien. 

 In his response to Interbay's summary judgment motion and his own cross-summary judgment motion, Sheppard first challenged Interbay's contractual superior
lien contention on the ground that the Interbay refinanced note and deed did not
contain any language indicating that they were renewals, extensions, or modifications
of the original Interbay note and deed. Rather, he asserted that the Interbay
refinanced note and deed constituted a "new loan and new mortgage" and that the
original Interbay note and deed had been "cancelled." In regard to Interbay's
"equitable contractual superior lien" contention, Sheppard asserted that Interbay was
not a third party to the transaction and, thus, was not entitled to rely on this claim. 
Sheppard also argued that Interbay's knowledge of the subordinate Lake Olympia lien
and Interbay's "unclean hands" precluded Interbay from seeking equitable
subrogation. He asserted that Interbay had allowed Chicago Title, the title company
handling the refinancing, to refinance the real property and pay proceeds from the
refinancing directly to Kimble without providing any consideration to PSM. (2) 

 In his cross-summary judgment motion, Sheppard agreed that Interbay had
refinanced its original Interbay loan, paid off the original Interbay note with the
proceeds from the Interbay refinanced loan, issued a new Interbay refinanced note,
and obtained a new Interbay refinanced deed securing payment. However, Sheppard
emphasized that because Interbay, as part of the refinancing, had released its original
Interbay deed, the Lake Olympia lien, as a result, became the first lien on the real
property. 

 The trial court, in an interlocutory order, granted Interbay's summary judgment
motion, ruling that Interbay was entitled to an "equitable first lien" on the real
property, and denied Sheppard's cross-summary judgment motion. Interbay then filed
another summary judgment motion for damages, which the trial court granted. In its
final judgment, the trial court ruled that Interbay was entitled to an "equitable first
lien" on the real property in the amount of $407,210.52, which represented the
amount of the proceeds from the refinancing used to pay off the outstanding balance
of the original Interbay note. (3)

Standard of Review

 To prevail on a summary judgment motion, a movant has the burden of proving
that it is entitled to judgment as a matter of law and that there is no genuine issue of
material fact. Tex. R. Civ. P. 166a(c); Cathey v. Booth, 900 S.W.2d 339, 341 (Tex.
1995). A plaintiff moving for summary judgment on its claim must establish its right
to summary judgment by conclusively proving all the elements of its cause of action
as a matter of law. Rhone-Poulenc, Inc. v. Steel, 997 S.W.2d 217, 223 (Tex. 1999);
Anglo-Dutch Petroleum Int'l, Inc. v. Haskell, 193 S.W.3d 87, 95 (Tex.
App.--Houston [1st Dist.] 2006, pet. denied). When a defendant moves for summary
judgment, it must either (1) disprove at least one essential element of the plaintiff's
cause of action or (2) plead and conclusively establish each essential element of its
affirmative defense, thereby defeating the plaintiff's cause of action. Cathey, 900
S.W.2d at 341; Yazdchi v. Bank One, Tex., N.A., 177 S.W.3d 399, 404 (Tex.
App.--Houston [1st Dist.] 2005, pet. denied). When both parties move for summary
judgment and the trial court grants one motion and denies the other, the reviewing
court should review the summary judgment evidence presented by both sides and
determine all questions presented and render the judgment that the trial court should
have rendered. Tex. Workers' Comp. Comm'n v. Patient Advocates of Tex., 136
S.W.3d 643, 648 (Tex. 2004). When deciding whether there is a disputed, material
fact issue precluding summary judgment, evidence favorable to the non-movant will
be taken as true. Nixon v. Mr. Prop. Mgmt. Co., 690 S.W.2d 546, 548-49 (Tex.
1985). Every reasonable inference must be indulged in favor of the non-movant and
any doubts must be resolved in its favor. Id. at 549.

Replacement of Senior Mortgage

 In its cross-issue, Interbay contends that the trial court erred in not granting 
it summary judgment on the ground that it was "contractually subrogated to the first
lien position." In response to Interbay's cross-issue, Sheppard asserts that the
Interbay refinanced note and deed did not contain language indicating that they were
renewals, extensions, or modifications of the original Interbay note and deed. 
Sheppard further asserts that the Interbay refinanced note and deed "were intended
to be a new loan and new mortgage," and Sheppard specifically points to evidence
that the two Interbay loans had different loan numbers and different principal
amounts, the original Interbay note was paid off in its entirety, Interbay charged a
prepayment penalty on the original Interbay loan, Kimble was issued a new title
policy in conjunction with the Interbay refinanced deed, and Interbay released the
original Interbay lien. 

 In its summary judgment motion, Interbay sought "to confirm [its] superior lien
status," and Interbay referred to the lien it sought from the trial court as a "contractual
superior lien." (4) Interbay also referred to the contractual documents as evidence that
it had never intended for its superior Interbay lien to become inferior to the Lake
Olympia lien. Interbay emphasized that Lake Olympia had expressly agreed that the
Lake Olympia lien would be subordinated to Interbay's lien and that Interbay would
maintain a "first superior lien," even after any renewals, extensions, and
modifications of the original Interbay note. As noted above, the Interbay deed
expressly provided security for the obligation in the Interbay note as well as "each
obligation contained in any renewal, extension, amendment, modification,
consolidation, change of, or substitution or replacement for, all or any party of this
[Interbay] Note [and] this Security Intstrument [Interbay Deed]." Also, the Lake
Olympia deed acknowledged that the Lake Olympia lien would be subordinate to the
Interbay lien as well as liens arising from any "renewals, extensions, and
modifications" of the Interbay note. When Kimble refinanced his Interbay loan, he
signed the "Interbay refinanced note," and, as reflected in the settlement statement,
$407,210.52 of the proceeds from the Interbay refinanced loan were used to pay the
outstanding balance of the Interbay note. 

 In considering Interbay's claim to a contractual superior lien on the real
property, we find guidance in section 7.3 of the Restatement (Third) of Property
(Mortgages), which provides,

 Replacement and Modification of Senior Mortgages: Effect on
Intervening Interests


(a) If a senior mortgage is released of record and, as part of the same
transaction, is replaced with a new mortgage, the latter mortgage
retains the same priority as its predecessor, except


(1) to the extent that any change in the terms of the
mortgage or the obligation it secures is materially
prejudicial to the holder of a junior interest in the
real estate, or


(2) to the extent that one who is protected by the
recording act acquires an interest in the real estate at
a time that the senior mortgage is not of record.


Restatement (Third) of Property (Mortgages) § 7.3 (1997). The comments to
section 7.3 explain that "a senior mortgagee that discharges its mortgage of record
and records a replacement mortgage does not lose its priority as against the holder of
an intervening interest unless that holder suffers material prejudice." Restatement
(Third) of Property (Mortgages) § 7.6 cmt. b (1997). While the "increase in the
principal amount will prejudice the holders of junior interests," a replacement
mortgage under section 7.3 retains seniority "except to the extent of" the increase in
principal. See id. Section 7.3 "aims at resolving those problems in a manner that
protects the legitimate expectations of the holders of junior interests, while at the
same time denying them the ability to veto workouts or other flexible restructuring
arrangements between mortgagors and senior lenders." Restatement (Third) of
Property (Mortgages) § 7.6 cmt. a (1997).

 Here, Sheppard does not refer us to any evidence that he was prejudiced by
Interbay retaining its first lien on the real property in the amount of the balance of the
Interbay lien prior to the refinance. We conclude that the summary judgment record
before us defeats any claim of prejudice as a matter of law. See Providence Inst. for
Sav. v. Sims, 441 S.W.2d 516, 520 (Tex. 1969) (noting that "there [was] no
contention" that intervening mechanic's lienholder "was placed in a worse position"
by lender who sought equitable subrogation after furnishing funds to retire portion
of debt secured by first lien on property); see also Murray v. Cadle, 257 S.W.3d 291, 
300 (Tex. App.--Dallas 2000, pet. denied) (stating that "[a] junior lienholder does not
suffer prejudice merely because it is not elevated in priority"); Farm Credit Bank of
Tex. v. Ogden, 886 S.W.2d 305, 311 (Tex. App.--Houston [1st Dist.] 1994, no pet.)
(stating that equitable subrogation does not prejudice junior lienholder if it leaves him
in same position on date lienholder recorded its interest). We also note that nothing
in the trial court's judgment implies in any way that the Lake Olympia lien has been
released. In fact, on appeal, Interbay has dropped this assertion, instead seeking to
establish its priority over the Lake Olympia lien. The trial court, in its judgment,
consistent with the principles articulated in section 7.3 of the Restatement, only
granted Interbay a first lien as to the amounts paid from the refinancing proceeds to
discharge the original Interbay note, not on any other amounts, including the amounts
for the cash proceeds paid to Kimble. (5) Based upon the contractual documents, and
applying the principles set forth in section 7.3, we hold that Interbay was entitled to
maintain a first lien on the real property in the amount of $407,210.52, which
represents the balance of the first lien prior to the refinance. (6)
 


 Finally, we note that section 7.3 expressly contemplates that the first mortgage
at issue will be released of record and, as part of the same transaction, will be
replaced with a new mortgage. Restatement (Third) of Property (Mortgages)
§ 7.3 (1997). Thus, Sheppard's assertions that the two Interbay loans had different
loan numbers and different principal amounts, the original Interbay note was paid off
in its entirety, Interbay charged a prepayment penalty on the original Interbay loan,
Kimble was issued a new title policy in conjunction with the Interbay refinanced
deed, and Interbay released the original Interbay lien are unavailing.

 We sustain Interbay's first cross-issue.

Conclusion


 We modify the judgment of the trial court to delete all uses of the word
"equitable" when referring to the first lien held by Interbay on the real property, and,
as modified, we affirm the judgment of the trial court. 



 Terry Jennings

 Justice


Panel consists of Justices Jennings, Bland, and Hudson. (7)

1. For convenience, we will still refer to this note and deed, after the assignment to PSM,
as the "Lake Olympia note and deed."
2. In support of this assertion, Sheppard attached to his response and motion an affidavit
from Andrew Choy, the former president of Lake Olympia and manager of PSM. 
Choy testified that at the original September 25, 2002 closing, he had executed a
release of the Lake Olympia lien and had delivered this release to PSM "for safe
keeping and escrow" to be recorded only upon full payment of the Lake Olympia
note. Choy explained that, in April 2004, when Kimble approached Lake Olympia
about his efforts to refinance the original Interbay loan and avoid losing his property
to foreclosure, Choy agreed to fully release the Lake Olympia lien if PSM was paid
$44,000 from the refinancing proceeds. Choy later learned that Kimble's refinancing
had been accomplished without any payment to release the Lake Olympia lien. Choy
stated that the original Lake Olympia release was never recorded because PSM had
never received the agreed upon $44,000. On appeal, Interbay is not asserting that the
Lake Olympia lien was released, nor is it challenging Sheppard's arguments that PSM
had only agreed to release the Lake Olympia lien if it was paid $44,000 from the
refinancing proceeds. Rather, Interbay asks us to simply affirm the judgment on the
ground that it "held an equitable first lien" on the real property or the ground that it
was "contractually subrogated to the first lien position" on the real property. 
3. Interbay agrees that is not entitled to priority for any additional proceeds from the
refinancing, including the amounts directly paid to Kimble.
4. Interbay's summary judgment motion presented this as an alternative to a lien arising
from principles of equitable subrogation. 
5. Although section 7.6 of the Restatement (Third) of Property (Mortgages) deals with
equitable subrogation, the comments to this section provide guidance in the situation
of a refinancing lender who lends funds exceeding the amount of the preexisting
mortgage. See Restatement (Third) of Property (Mortgages) § 7.6 cmt. e
(1997) (emphasis added). The comments provide,


Subrogation will be recognized only if it will not materially prejudice
the holders of intervening interests. The most obvious illustration is that
of a payor who lends the mortgagor more money than is necessary to
discharge the preexisting mortgage. The payor is subrogated only to the
extent that the funds disbursed are actually applied toward payment of
the prior lien. There is no right of subrogation with respect to any
excess funds. 


Id. (emphasis added).
6. In light of our holding, we need not reach Sheppard's two issues, in which he argues
that the trial court erred in granting Interbay summary judgment on the ground that
Interbay was entitled to an equitable lien on the real property and in denying his cross-summary judgment motion because (1) Interbay is not a third party and its knowledge
of the prior Lake Olympia lien, as well as Interbay's unclean hands, precluded the
application of equitable subrogation, and (2) even if Interbay was entitled to
subrogation, Interbay had released its rights to a lien on the real property. However,
we note that the Restatement suggests that whether Interbay's claim is properly
characterized as a replacement or modification of a prior mortgage under section 7.3
or as equitable subrogation under 7.6 is without significant consequence. See
Restatement (Third) of Property (Mortgages) § 7.6 cmt. e (1997) (comparing
section 7.3, which addresses replacement and modification of senior mortgages, with
section 7.6, which addresses subrogation, and stating that requirements of these
sections are "essentially similar" and that "results" reached under these are
"analagous"). 


 We also note that Texas courts have "long recognized a lienholder's common law
right to equitable subrogation." LaSalle Bank Nat'l Ass'n v. White, 246 S.W.3d 616,
618-19 (Tex. 2007) (recognizing lender's equitable subrogation rights under common
law and holding that lender was equitably subrogated to prior lienholders' interest
and, thus, could pursue recovery "for the refinance portion of the loan proceeds" that
were used to pay purchase-money and tax liens on homestead property); see also
Benchmark Bank v. Crowder, 919 S.W.2d 657, 661 (Tex. 1996) (holding that bank
that loaned money to homeowners to pay federal taxes was equitably subrogated to
federal tax liens against property and stating that "[o]nce valid, the lien [did] not
become invalid against the homestead simply because the original debt [had] been
refinanced").


 We further note that the Texas Supreme Court has explained the benefits of equitable
subrogation as applied in the context of a refinancing transaction, noting that
equitable subrogation permits property owners "to renew, rearrange, and readjust [an]
encumbering obligation to prevent a loss" through foreclosure. Benchmark Bank, 919
S.W.2d at 661 (explaining benefits of applying equitable subrogation in context of
refinancing transaction involving homestead property); LaSalle Bank Nat'l Ass'n, 246
S.W.3d at 620 (stating that "[w]ithout equitable subrogation, lenders would be
hesitant to refinance [] property due to increased risk that they might be forced to
forfeit their liens"); see also Diversified Mortgage Investors v. Lloyd D. Blaylock
Gen. Contractor, Inc., 576 S.W.2d 794, 807 (Tex. 1978) (recognizing importance of
equitable subrogation to lenders in Texas because doctrine "serves to protect a
lienholder from intervening liens, at least to the amount of the initial lien, when the
lienholder has discharged a prior superior lien"); Faires v. Cockrill, 88 Tex. 428, 437,
31 S.W. 190, 194 (1895) (stating that "[p]erhaps the courts of no state have gone
further in applying the doctrine of subrogation than has the court of this state" and
that "[o]ne who discharges the vendor's lien upon lands,--even the
homestead,--either by paying as surety, or at the request of the debtor, or at a judicial
sale, which, for irregularities in the process, fails to convey the title, is entitled to be
subrogated to the lien of the creditor to the extent of the payment so made"). 
Moreover, Texas courts have generally indicated that a refinancing lender's
knowledge of a subordinate lien does not automatically defeat a claim for subrogation.
 See Providence Inst. for Sav. v. Sims, 441 S.W.2d 516, 520 (Tex. 1969) (holding that,
under circumstances presented in that case, "neither actual nor constructive
knowledge of the intervening lien [would] defeat the right of subrogation to which the
debtor agreed . . .").

 

 Finally, we note that a recent, thorough opinion from the Supreme Court of
Washington surveying equitable subrogation cases from around the country has
characterized Texas as one of several jurisdictions to have followed the more liberal
Restatement approach on equitable subrogation, which considers "actual or
constructive knowledge of intervening interests [to be] irrelevant." Bank of America,
N.A. v. Prestance Corp., 160 P.3d 17, 21, 25 (Wash. 2007) (citing Farm Credit Bank
of Tex. v. Ogden, 886 S.W.2d 305, 311 (Tex. App.--Houston [1st Dist.] 1994, no
pet.); Chicago Title Ins. Co. v. Lawrence Invs., Inc., 782 S.W.2d 332, 334 (Tex.
App.--Fort Worth 1989, writ ref'd)); see also Restatement (Third) of Property
(Mortgages) § 7.6 cmt. e (1997) ("[S]ubrogation can be granted even if the payor
had actual knowledge of the intervening interest. . . . The question in such cases is
whether the payor reasonably expected to get security with a priority equal to the
mortgage being paid.")). As explained by the court in Bank of America, a rule that
would preclude equitable subrogation simply because a refinancing lender has
knowledge of prior or intervening liens would defeat the availability of equitable
subrogation in many refinancing transactions. Bank of America, N.A., 160 P.3d at 22
(stating that such rule would "render[] equitable subrogation nearly useless since a
refinancing mortgagee will almost always have either actual or constructive knowledge
of junior lienholders"). 

7. The Honorable J. Harvey Hudson, retired justice, Fourteenth Court of Appeals,
Houston, Texas, participating by assignment.